UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| vs. | : | CRIMINAL NO. 3:16-CR-107 (JAM) |
| ELLSWORTH ROBERTSON | : | August 8, 2016 |

**MEMORANDUM IN SUPPORT OF MOTION TO SUPPRESS**

**TABLE OF CONTENTS**

STATEMENT OF FACT I: MOHEGAN SUN SEARCH ................................................................ 2

STATEMENT OF FACT II: APARTMENT SEARCH .................................................................. 3

LEGAL STANDARD ...................................................................................................................... 4

I.   Mohegan Sun Search ............................................................................................................. 4

II.  Apartment Search .................................................................................................................. 6

ARGUMENT ................................................................................................................................... 7

I.   The search of Mr. Robertson's belongings on November 7, 2015, violated the Fourth Amendment. ................................................................................................................................... 7

II.  The fruits of the Illegal Search of Mr. Robertson on November 7, 2015, including all evidence obtained pursuant to the May 16, 2016, arrest warrant, must be suppressed. .................... 9

III. The May 18, 2016, search for and seizure of the safe in Mr. Robertson's apartment violated the Fourth Amendment. ................................................................................................................. 10

1. The search of Mr. Robertson's closet exceeded the lawful scope of a protective sweep. ............. 11

2. Any further inspection of the safe compounded the unlawfulness of the search. ........................ 12

3. The safe was not subject to seizure under the plain view doctrine. ............................................. 12

IV. The fruits of the May 18, 2016, search, including the subsequent search of the safe and of Mr. Robertson's apartment, should be suppressed. ............................................................................... 13

CONCLUSION ............................................................................................................................... 14

The "pat-down search" and the "protective sweep" are not lawful investigative tools. These narrowly drawn exceptions to the Fourth Amendment are defined and delimited by their purpose—the protection of officer safety. In a series of troubling oversteps, however, law enforcement officers in this case have transformed these defensive carve-outs into offensive investigative tools. In two separate searches driven not by concerns for safety but by the quest for contraband, law enforcement officers not only violated Mr. Robertson's constitutional rights, but they used the fruits of these violations to falsely justify further investigation. For the reasons that follow, the fruits of this poisonous vine must be suppressed.

## STATEMENT OF FACT I: MOHEGAN SUN SEARCH

According to a report prepared by the Mohegan Tribal Police, on November 7, 2015, tribal police were investigating a reported assault. During the course of the investigation, a "description of a possible suspect was received of a black male wearing a green jacket, jeans, and a green cap." Mohegan Sun incident report, attached as **Exhibit 1**, at 5. Officers approached Mr. Robertson, whom the report described as a "black male wearing a green knit cap, green blazer and blue jeans." *Id*. The reporting officer, Clifford Barrows, noticed a folding knife clipped in Mr. Robertson's pocket, which the officer took. *Id*.

According to the report, Officer Barrows indicated that he wanted to "check [Robertson] to see if he had any other weapons on him," to which Robertson replied, "go ahead." *Id*. Mr. Robertson denies giving consent to any search beyond a check for weapons.

Officer Barrows then proceeded to remove items from Mr. Robertson's pockets, including cash, a cellphone, and personal items. *Id*. Among the items removed was "a cloth pouch . . . that had bard items inside. This pouch was tied closed and [Robertson] said that it contained spiritual items." *Id*. Also removed from Mr. Robertson's clothing was "a black cloth bag with a draw string." *Id*. After removing the bag from Mr. Robertson's pocket, Officer Barrows "looked into the bag and saw a number of plastic baggies that contained white powder and rock like material. From my training

2

and experience I recognized these items as consistent with the packaging of cocaine and crack for street sale." *Id*. Officer Barrows subsequently arrested Mr. Robertson. *Id*.

### STATEMENT OF FACT II: APARTMENT SEARCH

On May 16, 2016, ATF Special Agent Dan Prather submitted an affidavit to Magistrate Judge Margolis seeking a warrant for Mr. Robertson's arrest. The affidavit principally outlined the allegations discussed above. *See* DE #1. The affidavit also stated nonspecifically that confidential sources had indicated that Mr. Robertson and a Tyrone Henry were distributing crack cocaine and that review of telephone toll information showed that Mr. Robertson and Mr. Henry regularly communicated. *Id*. Magistrate Judge Margolis signed the warrant on May 16, 2016. *Id.*

According to police, shortly before 3:00 AM on May 18, 2016, law enforcement officers (including ATF agents, members of a Connecticut statewide task force and local New London police) entered Mr. Robertson's apartment at 35 Union Street in New London to serve the above arrest warrant. Search warrant application, to be filed separately as **Exhibit 2**, at 3.[1] Upon entering the apartment, officers immediately arrested Mr. Robertson. "A secondary search for additional occupants was conducted to no avail." *Id*.

According to the police, "[d]uring the secondary search officers observed in plain view a medium size safe in the bedroom closet of Robertson room. On top of the safe was a white powder substance consistent to that of cocaine residue. A Nik swab for Cocaine showed a positive reaction for the presence of Cocaine." *Id*. No swab matching this description is included among the evidence cataloged by officers. *See* Incident Report attached as **Exhibit 3**. According to Mr. Robertson's then-girlfriend, Nilda Melendez, "[t]he safe was inside the [bedroom] closet to the right on the floor in the nook of the closet and on top of the safe were boxes." Statement of Nilda Melendez, attached

---

[1] Exhibits 2 and 6 consist of search warrants and accompanying affidavits that were initially sealed by a Connecticut state court judge for a two-week period following their issuance in May of 2016. While it appears that the State of Connecticut has not sought to extend the sealing orders applicable to these warrants, confirmation of their status is pending. These documents will be filed separately, either publicly or under seal as appropriate, as soon as confirmation of their status is received.

as **Exhibit 4**. As Ms. Melendez further explains, "even standing inside the bedroom you cannot see the safe because it is located on the floor in the nook of the right side of the closet." *Id*.

After the safe was located, "ATF secured and removed the safe from the apartment prior to the residence being secured[.]" **Exhibit 2** at 3. Jeremy Zelinski, a member of the New London police department, on May 20, 2016, submitted a search warrant affidavit to a Connecticut judge, requesting authorization to search the seized safe. *Id*. The warrant was signed the same day. ATF agents subsequently breached the safe and recovered items that appear to include narcotics and weapons. *See* Report of Investigation, attached as **Exhibit 5**.

## LEGAL STANDARD

The Second Circuit has explained that:

> A warrantless search is *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions. In support of a motion to suppress evidence found in a warrantless search, the defendant must show that he had a reasonable expectation of privacy in the place or object searched. If such a privacy interest is established, the government has the burden of showing that the search was valid because it fell within one of the exceptions to the warrant requirement.

*United States v. Perea*, 986 F.2d 633, 639 (2d Cir. 1993) (citations and internal quotation marks omitted).

### I.  Mohegan Sun Search

Under the standard first articulated in *Terry v. Ohio*, "'[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others,' the officer may conduct a pat-down search 'to determine whether the person is in fact carrying a weapon.'" *Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993) (quoting *Terry v. Ohio*, 392 U.S. 1, 24 (1968)).

As an extension of this principle, "[i]f a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons[.]" *Dickerson*, 508 U.S. at 375. Consequently, "if the object is contraband, its

4

warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context." *Id*. at 375-76.

As the Second Circuit has put it, under the principles outlined in *Terry* and later *Dickerson*, "[i]f the frisk for a weapon is conducted in compliance with proper standards and results in recognition of the likely presence of narcotics, it is immaterial that what was discovered is not the article for which the police officers were originally and specifically looking." *United States v. Salazar*, 945 F.2d 47, 51 (2d Cir. 1991) (internal quotation marks omitted). This principle, by its own formulation, does not apply, however, when a search is not "in compliance with proper standards." *Id*. Specifically, the search "must be limited in scope to this protective purpose. Nothing in *Terry* can be understood to allow a generalized 'cursory search,' for in the absence of arrest, probable cause, or a search warrant, the officer's right to search for weapons must be balanced against the individual's right to privacy[.]" *McCardle v. Haddad*, 131 F.3d 43, 48–49 (2d Cir. 1997). *See also Florida v. Royer*, 460 U.S. 491, 500 (1983) ("the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time").

With respect to searches pursuant to claimed consent, the Supreme Court has explained that "[w]here the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." *Florida v. Royer*, 460 U.S. 491, 497 (1983); *see also United States v. Gandia*, 424 F.3d 255, 265 (2d Cir. 2005) ("The scope of the suspect's consent is a question of fact, and [t]he government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary." (Internal quotation marks omitted)).

Additionally, as the Supreme Court recognized in *Florida v. Jimeno*, 500 U.S. 248 (1991), "[a] suspect may of course delimit as he chooses the scope of the search to which he consents." *Id*. at 252. The Court further explained that "[t]he standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical

5

reasonable person have understood by the exchange between the officer and the suspect?" *Id.* at 252. "The scope of a defendant's consent to a search is a question of fact[.]" *United States v. Miles*, 263 F. App'x 77, 78 (2d Cir. 2008)

### II.     Apartment Search

The United States Supreme Court established in *Chimel v. California*, 395 U.S. 752 (1969), that "[a] similar analysis [to that articulated in *Terry v. Ohio*] underlies the 'search incident to arrest' principle, and marks its proper extent." *Id.* at 762. The Court explained, in the context of an arrest "[t]here is ample justification, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Id*. at 763.

The *Chimel* court went on to clarify, however, that "[t]here is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant." *Id.*

The consequence of this rule, the Court subsequently explained in *Maryland v. Buie*, 494 U.S. 325 (1990), is that police may without additional basis "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id*. at 334. Beyond this immediate area, a "protective sweep," defined as "not a full search of the premises" but rather "only to a cursory inspection of those spaces where a person may be found," may be conducted if—and only if—there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id*. at 334-35. Such a sweep, moreover, must "[last] no longer than is necessary to dispel the reasonable suspicion

of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Id.* at 335-36.

With respect to the seizure of an item in the context of a search conducted in connection with an arrest, the Supreme Court has articulated the following three requirements: (1) that "the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed"; (2) that "not only must the item be in plain view; its incriminating character must also be immediately apparent," and (3) that "not only must the officer be lawfully located in a place from which the object can be plainly seen, but he or she must also have a lawful right of access to the object itself." *Horton v. California*, 496 U.S. 128, 136–37 (1990) (citation omitted). In a subsequent opinion the Supreme Court further articulated that, as a corollary of the second requirement, if "the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object—i.e., if its incriminating character [is not] immediately apparent—the plain-view doctrine cannot justify its seizure." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993) (citation and internal quotation marks omitted).

## ARGUMENT

**I.     The search of Mr. Robertson's belongings on November 7, 2015, violated the Fourth Amendment.**

Mohegan tribal police officer Barrows far exceeded the permissible scope of a protective frisk for weapons authorized by the Fourth Amendment. Officer Barrows hardly limited his search to a pat-down of Mr. Robertson's outer clothing. Instead, as his own report describes, he conducted a thoroughgoing search and systematically removed items from Mr. Robertson's person, including money, a cellphone, and other personal items that bore no resemblance to a weapon. Not satisfied with simply removing items from Mr. Robertson's clothes, the officer went a step further and inspected the inside contents of at least one package. Only then—after (1) thoroughly searching Mr. Robertson's pockets, (2) removing their contents, and (3) conducting further inspection—did Officer Barrows determine that, in his training and experience, the contents of a container in Mr. Robertson's possession was contraband.

7

The standards established by *Terry* and its progeny forbade Officer Barrows from going any further than patting Mr. Robertson's pockets to confirm that their contents did not include any weapons. Removing the contents of Mr. Robertson's pockets for any reason other than to retrieve a weapon or another object plainly identifiable by plain touch as contraband was illegal. So too was the officer's decision to further inspect the pouch he retrieved from Mr. Roberson's pocket, a pouch that very clearly was not a weapon. This case is a far cry from the situation in which an officer, conducting a pat-down, identifies by touch an object the officer can immediately recognize as contraband. *Cf. United States v. Salazar*, 945 F.2d 47, 51 (2d Cir.1991) (affirming denial of motion to suppress where pat-down resulted in officer feeling "crackling plastic, which betrayed the presence of crack vials").

Mr. Robertson's claimed consent to search does not change the analysis. Even assuming Mr. Robertson had, as Officer Barrows claims, agreed to a request to check for weapons, such consent permitted Officer Barrows to do only that—conduct a check for weapons. "A suspect may of course delimit as he chooses the scope of the search to which he consents." *Jimeno*, 500 U.S. at 252. Here, if Officer Barrows' account is to be credited, he sought and received authorization specifically and exclusively to check for weapons. This is not a case in which the officer requested permission to conduct an open-ended examination. *Cf. Winfield v. Trottier*, 710 F.3d 49, 55 (2d Cir. 2013) ("consent was not limited to a search for guns or money because [officer's] full question did not convey any 'expressed object' of the search"). Nor is this a case where the officer sought and received permission to conduct a full-scale "search." *Cf.* U*nited States v. Snow*, 44 F.3d 133, 135 (2d Cir. 1995) (examining dictionaries and holding that because "under either the King's or the Colonists' English, the term 'search' implies something more than a superficial, external examination," then consent to "search" authorized opening of closed container).

The nature and limited scope of a "check" for weapons is well established and readily recognized not only in the annals of the federal reporters, but also on the streets of America and in the country's collective consciousness. Checking for weapons is precisely, and only, what *Terry* authorizes. The pat-down frisk authorized under *Terry* is "a carefully limited search of the

8

defendant's outer clothing to check for weapons[.]" *United States v. Gonzalez*, 319 F. Supp. 563, 565 (D. Conn. 1970); *accord United States v. Crump*, 62 F. Supp. 2d 560, 563 (D. Conn. 1999) (describing "a pat-down search of that person, commonly referred to as a 'frisk,' in order to check for any weapons"). No reasonable person would understand authorization to check for weapons to include removing a small drawstring bag from a person's pocket and then peering into it despite the fact that the pouch in no way resembled a weapon or even appeared capable of containing a weapon. Such a thorough investigative inspection far exceeded any consent by Mr. Robertson just as it exceeded the permissible scope of a check for weapons under *Terry*.

> II.   **The fruits of the Illegal Search of Mr. Robertson on November 7, 2015, including all evidence obtained pursuant to the May 16, 2016, arrest warrant, must be suppressed.**

The drugs discovered on Mr. Robertson's person pursuant to the illegal search on November 7, 2015, must be suppressed as fruits of that search. Those materials, however, are not the only tainted fruit of the November 7, 2015, search. "[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or fruit of the poisonous tree. It extends as well to the indirect as the direct products of unconstitutional conduct." *Segura v. United States*, 468 U.S. 796, 804 (1984) (citations and internal quotation marks omitted).

In considering whether evidence obtained in a subsequent search arising from a warrant is nonetheless tainted by the previous illegal uncovering of evidence, "[t]he ultimate question . . . is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here." *Murray v. United States*, 487 U.S. 533, 542 (1988). As the *Murray* Court specified, the "independent source" principle would not save the subsequent search "if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." *Id.* (footnote omitted).

In this case, the validity of the May 16, 2016, warrant pursuant to which Mr. Robertson was arrested on May 18, 2016, fundamentally depends upon the use of that evidence. The arrest warrant was issued upon a determination that there was probable cause to believe that Mr. Robertson possessed with intent to distribute controlled substances in violation of 21 U.S.C. § 841. *See* DE #1. In the affidavit in support of the arrest warrant on, Special Agent Prather identified, as the controlled substances Mr. Robertson allegedly possessed, only the drugs taken from Mr. Robertson on November 7, 2015. Although the affidavit also made general reference to confidential informants who believed Mr. Robertson sold drugs, the affidavit referenced no other concrete instances of anyone seeing Mr. Robertson with drugs. It contained no references to any controlled buys of drugs from Mr. Robertson by law enforcement. It contained, in short, no information that would lead a neutral magistrate to conclude that there was probable cause that Mr. Robertson violated the law by possessing a controlled substance with intent to distribute—other than the information obtained by the illegal November 7, 2015, search.

Because the arrest warrant affidavit did not contain other information untainted by the illegal November 7, 2015, search, this is not a case in which an "independent source" provides an alternate information stream that may attenuate the taint of the initial illegal search for purposes of the later warrant. *Cf. Segura*, 468 U.S. at 814 (suppression of evidence obtained in subsequent warrant search not required where "[n]one of the information on which the warrant was secured was derived from or related in any way to the initial entry into petitioners' apartment"); *United States v. Agapito*, 620 F.2d 324, 338 (2d Cir. 1980) (suppression not required where "[t]wo untainted portions of the affidavit contain a sufficient showing of probable cause to render the warrant valid, despite the reference to tainted events which occurred after the illegal entry"). Here, if the tainted evidence is excised from the May 16, 2016, warrant affidavit, probable cause evaporates.

### III.     The May 18, 2016, search for and seizure of the safe in Mr. Robertson's apartment violated the Fourth Amendment.

Independent of the taint arising from the illegal November 7, 2015, search, the seizure of the safe in Mr. Robertson's apartment was a separate violation of his Fourth Amendment rights. The

10

search occurred in Mr. Robertson's apartment, conferring standing to challenge the search. *See Bumper v. N. Carolina,* 391 U.S. 543, 548 n.11 (1968). He also maintained an objective and subjective expectation of privacy in his apartment. Although the Second Circuit has held that a person on supervised release, has by virtue of signing those conditions "a severely diminished expectation of privacy with respect to any home visit by a probation officer," *United States v. Reyes*, 283 F.3d 446, 461 (2d Cir. 2002), the terms of his release do not destroy his expectation of privacy. The terms of Mr. Robertson's release provide that "[t]he defendant shall permit a probation officer to visit the defendant at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer[.]" *United States v. Ellsworth Robertson*, 3:07-cr-00205-SRU DE #27. This provision does not permit searches by Probation Officers beyond what would be visible in "plain view." What's more, it says nothing about non-probation law enforcement officers present at this home in connection with a separate criminal investigation.

Even assuming that law enforcement officers were lawfully in Mr. Robertson's apartment to arrest him, the "secondary search" of his apartment resulting in the discovery of the safe violated his right to privacy under the Fourth Amendment because (1) the search exceeded the proper scope of a protective sweep, (2) any further inspection or analysis of the safe was a further unlawful and unwarranted search, and (3) the safe was not obvious contraband that could lawfully be seized without a warrant.

1. *The search of Mr. Robertson's closet exceeded the lawful scope of a protective sweep.*

As the police admit, they discovered the safe in Mr. Robertson's apartment not in the course of arresting Mr. Robertson, but rather during a "secondary search" of his apartment. As the Supreme Court explained in *Buie*, the Fourth Amendment does not permit officers to search a premises after arresting a person. The most it permits is a "cursory inspection of those spaces where a person may be found," provided that there is articulable suspicion such a person will be found. 494 U.S. at 334-35. Having arrested Mr. Robertson, the police had no basis, other than pure speculation, to believe that there was any other person in another room of the house, let alone in a small bedroom closet. Even if officers had such articulable suspicion, an appropriate cursory

11

inspection of the bedroom area would not have revealed a small safe tucked in a nook of the closet. As the statement of Ms. Melendez and accompanying video indicate, a person standing in the bedroom would be well able to ascertain that the closet did not contain a person without looking inside the closet and down to the safe. The search of Mr. Robertson's bedroom and closet, and consequent location of the safe, cannot be reconciled with *Buie*.

   2. *Any further inspection of the safe compounded the unlawfulness of the search.*

Police assert that, having seen the safe in "plain view," an officer observed white powder on top of the safe. As the statement by Nilda Melendez indicates, however, boxes were stored on top of the safe; any removal of these boxes would have been an unlawful extension of the "protective sweep" authorized under *Buie* only for the detection of people who may be threats to officer safety.

The police account then goes on to assert that police performed a "Nik swab" test for drug residue. As this development underscores, police were searching Mr. Robertson's apartment not merely out of concern that there might be a person in the apartment who posed a safety risk. Instead, the police were looking for contraband—searching for evidence of a crime. Instead of conducting themselves as *Buie* instructs and limiting their time in Mr. Robertson's apartment to "no longer than it takes to complete the arrest and depart the premises," *id*. at 335-36, the officers lingered, using their presence in the apartment to conduct further investigation. To properly do that, however, the police should have sought a search warrant as well as an arrest warrant. They did not, and in conducting an investigation beyond the scope of a protective sweep they violated Mr. Robertson's Fourth Amendment rights. As the Supreme Court emphasized in *Dickerson*, if "the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object," the object cannot be lawfully seized based on the plain-view doctrine. 508 U.S. at 375.

   3. *The safe was not subject to seizure under the plain view doctrine.*

Even assuming that the police lawfully observed the safe in Mr. Robertson's bedroom closet and upon further investigation lawfully discovered what appeared to be cocaine on top of the safe, they still were not entitled to seize the entire safe. Pursuant to *Horton*, an object seen in plain view

12

may be seized only if it meets the requirement that "its incriminating character must also be immediately apparent[.]" 496 U.S. at 136. Here, at most the officers had reason to believe that there was contraband on top of the safe, but not make it "immediately apparent" that the safe itself was contraband or incriminating. There is nothing illegal about owning a safe, and people routinely keep safes in their residences to store important documents. The officers may well have had reason to suspect that there was contraband in the safe, but "suspect view" is not "plain view."

**IV.   The fruits of the May 18, 2016, search, including the subsequent search of the safe and of Mr. Robertson's apartment, should be suppressed.**

Following the May 18, 2016, search of Mr. Robertson's apartment, officers sought and obtained a further search warrant authorizing a search of the apartment. *See* **Exhibit 2**. Aside from the reference to cocaine powder allegedly found on top of the safe, the affidavit made no reference to drugs or drug paraphernalia seen in plain view in the apartment. *Id.* Indeed, other than the powder on top of the safe, the only other remarkable aspect of the apartment identified in the affidavit was that some ceiling tiles appeared to be out of place. *Id.* The affidavit also offered no assertion that officers had specific reason, other than the powder discovered on the safe, to believe that Mr. Robertson sold drugs from the apartment or stored them in the apartment. *Id.* The sole concrete indicator pointing to drugs in Mr. Robertson's apartment, that is to say, was the discovery of drugs during the "secondary search" of his apartment following his arrest.

Following the execution of the residential search warrant, police submitted a further warrant application to search the contents of the previously seized safe. *See* Safe search warrant application, submitted separately as **Exhibit 6**. This affidavit reiterated the statements of the residential warrant application and added assertions regarding the seizure of additional drugs and drug paraphernalia discovered during the residential search. *Id.* On the strength of these assertions, a warrant issued authorizing search of the safe. *Id.*

Both the residential search warrant application and the safe search warrant application ultimately depend for their showing of probable cause on information illegally obtained during the

May 18, 2016, "secondary search" following Mr. Robertson's arrest. Where, as here, the illegally obtained evidence "was presented to the Magistrate and affected his decision to issue the warrant," a subsequent warrant is the fruit of the illegal search and its fruits may be suppressed. *Murray*, 487 U.S. at 542 (1988).

## CONCLUSION

For the reasons above, all fruits of the November 7, 2015, May 18, 2016, and May 20, 2016, searches of Mr. Robertson's person and property should be suppressed.

Respectfully submitted,

THE DEFENDANT,
Ellsworth Robertson

OFFICE OF THE FEDERAL DEFENDER

Dated: August 8, 2016        /s/ James P. Maguire
James P. Maguire
Assistant Federal Defender
265 Church Street, Suite 702
New Haven, CT 06510
Phone: (203) 498-4200
Bar No.: ct29355
Email: James_Maguire@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 8, 2016, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

s/ James P. Maguire
James P. Maguire